**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON
CASE NO. 5:18-CR-81-S-JMH-MAS**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**v.**        **DEFENDANT OLOGEANU'S REPLY IN SUPPORT OF
HIS MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

**BENIAMIN-FILIP OLOGEANU**                             **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \*

Comes the Defendant, Beniamin-Filip Ologeanu (hereinafter "Ologeanu"), by counsel, and hereby submits this Reply in support of his Motion to Dismiss Superseding Indictment [DE 456]:

In his Motion [DE 456], Ologeanu argues that he cannot receive a fundamentally fair trial, and therefore a constitutionally valid trial, given his inability to procure witness testimony and present documentary evidence necessary to a complete defense. In its Response [DE 523], the Government argues (1) that to the extent Ologeanu's motion requires an evaluation of the evidence, it is premature; (2) that there are judicial means available to Ologeanu to secure the testimony of witnesses and the production of documents which he has not diligently pursued; (3) that Ologeanu has not alleged bad faith by the government, which it contends is necessary for relief in these situations; and (4) that Ologeanu has not demonstrated the materiality of the purportedly unavailable evidence. As demonstrated below, the Government's arguments do not sufficiently address, rebut or cure the legitimate concerns Ologeanu raises in regard to whether this process is fundamentally fair.

      **1. The Motion is Ripe for Adjudication.**

First, Ologeanu does cite to and relies on various facts, purported facts and alleged facts that are part of the discovery in making his constitutional challenge to this prosecution; however,

the concerns he raises with respect unavailable witnesses goes to the overarching question of fundamental fairness, and do not require an evaluation of the facts for proper adjudication. For instance, it is undisputed that foreign witnesses are beyond the subpoena power of the court. (Whether letters rogatory and Rule 15 depositions are adequate substitutes is a different issue that is addressed below). Further, it is undisputed that at one point, investigators had enough information about the online fraudster known as Johnla73 to conclude he may be a specific individual residing in Romania named Giani Chioru. Finally, it cannot be reasonably disputed that Ologeanu has a life in Romania, and by extension, has friends, neighbors and work colleagues, any one of whom could testify not only as to his daily routines, but also his character and/or his reputation. Even if the analysis is limited to Ologeanu's inability to compel the attendance at trial of Mr. Chioru to ask him questions related to his use of online personas such as Johnla73 and one or more of his friends, neighbors or work colleagues to illicit character testimony or testimony about his daily routine, neither of which requires an evaluation of disputed facts, the conclusion remains that he cannot present a complete defense in this instance that comports with fundamental fairness and due process. Accordingly, the issues raised herein are proper for adjudication at this stage. *See United States v. Craft,* 105 F. 3d 1123, 1126 (6th Cir. 1997).

    **2. Letters rogatory and Rule 15 depositions are not an adequate remedy.**

Next, letters rogatory and Rule 15 depositions are not an adequate substitution in this situation given the preference for live testimony, which is heightened in this case, and the limited utility of letters rogatory and Rule 15 depositions, particularly given the limited resources of criminal defendants and the extraordinary resources available to the Government.

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense …. This right is a fundamental element of due

process." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The law prefers live testimony over hearsay, a preference designed to protect everyone, particularly the defendant." *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982). "In both civil and criminal cases, our common law heritage has always favored the presentation of live testimony...." *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir.1977). The preference for live testimony, especially in the case of proffered hearsay statements, (*see*, e.g., Ologeanu's Motion for Enright Hearing [DE 457]), "is because of the importance of cross-examination, 'the greatest legal engine ever invented for the discovery of truth.'" *White v. Illinois*, 502 U.S. 346, 356 (citing *Green*, 399 U.S. at 158)).

"Underlying both the constitutional principles and the rules of evidence is a preference for live testimony. Live testimony gives the jury (or other trier of fact) the opportunity to observe the demeanor of the witness while testifying. William Blackstone long ago recognized this virtue of the right to confrontation, stressing that through live testimony, 'and this [procedure] only, the persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behavior, and inclinations of the witness.'" *U.S. v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007) (citing 3 William Blackstone, *Commentaries on the Laws of England* 373-74 (1768)). "Transcripts of a witness's prior testimony, even when subject to prior cross-examination, do not offer any such advantage, because 'all persons must appear alike, when their [testimony] is reduced to writing.'" *Id.* (citing *Blackstone*, at 374).

The United States Court of Appeals for the Third Circuit voiced the importance of observing, first-hand, a witness's demeanor while testifying:

> Demeanor is of the utmost important in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words. Even beyond the precise words themselves lies the unexpressed indication of his alignment with one side or the other in the trial. It is indeed rarely that a cross-

3

>examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is not infrequently that he leads a hostile witness to reveal by his demeanor – his tone of voice, the evidence of fear which grips him at the height of cross-examination, or even his defiance – that his evidence is not to be accepted as true, either because of partiality or overzealousness or inaccuracy, as well as outright untruthfulness. The demeanor of a witness, as Judge Frank said, is a 'wordless language.'

*Id.* (citing *Anquino*, 378 F.2d 548) (quoting *Broad. Music*, 175 F.2d at 80).

The importance of live testimony in this case, particularly in the matter of Mr. Chioru, is heightened and cannot be overcome by Rule 15 depositions or the use of letters rogatory. Indeed, "[t]he Supreme Court has noted that holding a trial at a location 'where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants.'" *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511 (1947), superseded by statute on other grounds.

In addition to be an inadequate substitute for live testimony, letters rogatory have other significant limitations. *See In Re Air Crash at Madrid, Spain, on August 20, 2008*, 893 F.Supp. 1020, 1032 (C.D. Cal. 2011). "This process [of using letters rogatory] has limitations, and courts have noted its shortcomings…." *Id.* (citing *Melgares v. Sikorsky Aircraft Corp.*, 613 F.Supp.2d 231, 243 n. 8 (D. Conn. 2009) (describing obtaining testimony of Spanish witnesses through letters rogatory as "a difficult and time-consuming—if not altogether futile—endeavor"); *Da Rocha v. Bell Hellicopter Textron, Inc.*, 451 F.Supp.2d 1318, 1325 (S.D. Fla. 2006) (describing letters rogatory as "notoriously insufficient"). "Letters rogatory are the medium, in effect, whereby one country, speaking through one of its courts, requests another country, acting through its own courts and by methods of court procedure peculiar thereto and entirely within the latter's control, to assist the administration of justice in the former country." *United States v. Al Fawwaz*, No. S7 98 CRIM. 1023 LAK, 2014 WL 627083, at *2 (S.D.N.Y. Feb 18, 2014) (internal quotation marks omitted).

4

Indeed, according to the Department of Justice Criminal Resource Manual, "Prosecutors should assume that the process will take a year or more. Letters rogatory are customarily transmitted via the diplomatic channel, a time-consuming means of transmission."[1] They would require not only the volunatey assistance of the Romanian Government and courts, but quite likely the voluntary assistance of Mr. Chioru.[2]

Finally, either process is cost prohibitive, is not certain, requires Ologeanu to develop and preserve such testimony before having had the benefit of hearing from the prosecution witnesses, all of which creates an unreasonable burden that, even if successful, would essentially require Ologeanu to face trial 5,000 miles from home relying almost exclusively on transcribed or recorded witness testimony for his defense. The Government's Response fails to acknowledge the inadequacies in this process, and similarly fails to appreciate the impracticalities of using such a measure here.

### 3. The decision to prosecute this action in the United States, rather than Romania, implicates due process rights that are not premised on bad faith.

The Government contends that a defendant must show the government acted in bad faith with respect to the unavailability of a witness in order to (successfully) raise a violation of his right to compulsory process. It relies on *United States v. Damra*, 621 F.3d 474, 489 (6th Cir. 2010) and *United States v. Skaggs*, 327 F.R.D. 165, 170 (S.D. Ohio 2018) for its proposition. However, these cases are distinguishable as it is significant that Ologeanu's case involves conduct that could be, and arguably should be, prosecuted in Romania. Thus, unlike *Damra* and *Skaggs*, where the United States district courts are the only available venue for prosecution of the allegedly criminal conduct at issue there, a dismissal here, based on principles of fundamental fairness would not result in "a

---

[1] *See* (https://www.justice.gov/archives/jm/criminal-resource-manual-275-letters-rogatory) (last visited Feb. 25, 2020).
[2] What's the remedy if Mr. Chioru does not appear as directed?

constitutional windfall" for Ologeanu. [DE 523]. Rather, it would likely result in a prosecution in Romania, where Ologeanu's concerns about a fair trial can be adequately addressed and effectively cured.

Due process has both a procedural component, as well as a substantive component, and the procedures proposed by the Government offer little substantive process to Ologeanu, or anyone in a similar circumstance, to ensure a fundamentally fair trial. "Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,', and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (citing *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (plurality opinion)); *Snyder v. Massachusetts,* 291 U.S. 97, 105 ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"); *Palko v. Connecticut,* 302 U.S. 319, 325-26 (1937). "Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decision making, that direct and restrain our exposition of the Due Process Clause. As we stated recently in *Flores,* the Fourteenth Amendment forbids the government to infringe ... fundamental liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* (internal quotations and citations omitted) (original emphasis).

The United States' interest is bringing law breakers to justice is as effectively served by a prosecution in Romania as it is by a prosecution here. More so, a prosecution in Romania, rather

than here, is more consistent with the "presumption that United States law governs domestically but does not rule the world." *See Micropsoft Corp., v. AT&T Corp.*, 550 U.S. 437 (2007); *see also* Huff v. Spaw, 794 F.3d 543 (6th Cir. 2015) (holding that "[t]here is a 'legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application' unless the 'statutory language, context, history, or purpose show the contrary.'") Lastly, the United States' self- interests are arguably furthered by requiring the alleged law breaker's home countries to pay the cost of detaining, prosecuting and then possibly incarcerating alleged law breakers. These various and perhaps conflicting state interests, combined with the unquestionable limitations on Ologeanu's ability to present a complete defense, mitigate in favor of dismissal.[3]

**4. The testimony of unavailable witnesses is material.**

The Government cautions against an evaluation of the evidence at this point, but then spends several pages of its Response arguing that Ologeanu's Motion fails to demonstrate anything material to his defense. The Government's argument ignores the fact that a defendant in a criminal case has an absolute right to introduce character evidence, meaning evidence of the defendant's own character, "because character is relevant in resolving probabilities of guilt." *Michelson v. U.S.*, 335 U.S. 469, 476 (1948) (citing 1 Wigmore, Evidence (3d ed., 1940) s 56; Underhill, Criminal Evidence (4th ed., 1935) s 165; 1 Wharton, Criminal Evidence (11th ed., 1935) ss 330, 336.). The Government's argument further ignores the fact that a defendant "may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he

---

[3] "[W]here the number of nonparty witnesses is large, coupled with the Court's natural preference for live testimony and the time-consuming nature of using letters rogatory … a district court's decision to weigh this factor in favor of dismissal will not be overturned." *Strategic Value Master Fund, Ltd. V. Cargill Financial Services, Corp.*, 421 F.Supp.2d 741, 769 (S.D.N.Y. 2006) *Id.* (citations omitted). In *Strategic Value Master Fund, Ltd.*, given that the defendant "identified at least nine nonparty witnesses central to its defense, and the general preference for live testimony," the court found "this factor weighs heavily in favor of dismissal." *Id.* (citations omitted).

would not be likely to commit the offense charged. This privilege is sometimes valuable to a defendant for [the Supreme Court of the United States] has held that such testimony, alone, in some circumstances, may be enough to raise reasonable doubt of guilt and that in the federal courts jury in a proper case should be so instructed." *Id.* (citing *Edgington v. United States*, 164 U.S. 361 (1896). The Government's argument also ignores the fact that a defendant's right to introduce character evidence is so valuable that courts have found failure to permit a defendant to introduce evidence of a character trait relevant to the offense charged or that makes it unlikely that he harbored the requisite criminal intent is reversible error. *U.S. v. Darland*, 626 F.2d 1235, 1237 (5th Cir. 1980). Finally, the Government's argument ignores the obvious evidentiary value that would flow from being able to ask Mr. Chioru, live and in person, whether he ever posed online as Johnla73, whether he was in a position to know certain facts about Ologenau's life and/or whereabouts at various times, and whether, in possession of said facts about Ologeanu, he was in a position to disseminate misinformation to the CS and others intended to put the investigators on to the tracks of a patsy. The inability of Ologeanu to have counsel ask Mr. Chioru pointed questions, in front of the jury, who would have an opportunity to observe his demeanor, creates the unnecessary circumstance where Ologeanu simply cannot receive a fair trial.

      The final point the Government makes as to Ologeanu is that he has not "attack[ed] the items located on his devises that [purportedly] connect him to Johnla." [DE 523]. To the extent the Government suggests said item will put to rest any doubt as to Ologeanu's connection to Johnla and the other aliases reportedly connected to him, such as Tribulus and LuckySlevin, the Government is wrong. For instance, forensic data retrieved from one such device, an HP Laptop, located at Ologeanu 00255831 indicates that its possessor, utilizing the online monikers Tribulus11 and LuckySlevin00, sent or received messages Yahoo Messenger platform in April 1999, when

8

Ologeunu was nine years old. However, this stage is not the forum for challenging disputed evidence. But, the Government's indication that it intends to rely heavily on forensic reports from said devices further highlights the inherent unfairness of this prosecution as the Government intends to rely on evidence gathered by a Romanian search team who presumably will not testify at trial, and which is not, according to the Government's positions taken in response to Motions to Suppress filed by two of Ologeanu's co-defendants, subject to scrutiny or challenge in this Court, regardless how or under what circumstances it may have been collected.

The Sixth Circuit has found that Rule 18 of the Federal Rules of Criminal Procedure "states the traditional rule of 'forum non conveniens' and vests discretion in the District Court to determine the proper place of trial." *U.S. v. Lewis*, 504 F.2d 92, 97 (6th Cir. 1974) (citing *Houston v. United States*, 419 F.2d 30, 33 (5th Cir. 1969)). "Trial judges traditionally have been held to have wide discretion in disposing of change of venue motions. However, that discretion cannot be used as an excuse not to give 'due regard to the convenience of the defendant and the witnesses' in fixing the place of trial." *Id.* at 97-98 (citations omitted). In the criminal context, the doctrine of *forum non conveniens* is also codified by Federal Rule of Criminal Procedure 21(b). The Rule provides that "[f]or the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." Courts consider the following factors in deciding a motion for transfer: (1) location of the defendant; (2) location of potential witnesses; (3) location of events that may be in dispute; (4) location of documents that are likely to be involved; (5) possible disruption of defendant's business if the case is not transferred; (6) cost to the parties; (7) counsel's location; (8) relative inaccessibility of the trial location; (9) workload of each district involved; and (10) other relevant factors that may affect transfer. *See Platt v. Minnesota Mining &*

*Mfg. Co.*, 376 U.S. 240, 243-44 (1964); *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir. 1979). It is well-settled that "[t]he Government's convenience is … a factor given little weight when other considerations of convenience suggest transfer of a trial under Rule 21(b)," *United States v. Gruberg*, 493 F.Supp. 234, 243 (S.D.N.Y. 1979); *see also United States v. Russell*, 582 F.Supp. 660, 662 (S.D.N.Y. 1984) (transferring a trial to Memphis, Tennessee, where defendants resided, stating that "[a]s a matter of policy … wherever possible, defendants should be tried where they reside" because of the hardship of having to stand trial away from home).

This prosecution should not go forward, at least not in this Court, and absent the ability to transfer it to a Romanian court, dismissal is the only effective remedy.

Respectfully submitted,

McBRAYER PLLC
201 E. Main Street, Suite 900
Lexington, KY 40507
(859) 231-8780
dguarnieri@mcbrayerfirm.com
tnichols@mcbrayerfirm.com

/s/David J. Guarnieri_____
DAVID J. GUARNIERI
TREVOR M. NICHOLS
ATTORNEYS FOR DEFENDANT
BENIAMIN-FILIP OLOGEANU

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of February, 2020, a true and correct copy of the foregoing was served electronically with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/David J. Guarnieri_____
DAVID J. GUARNIERI

4852-7284-7030, v. 1